IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

No. 22-2332

A.M., by her mother and next friend, E.M.,

*Plaintiff-Appellee,*

v.

INDIANAPOLIS PUBLIC SCHOOLS, *et al.,*

*Defendants,*

v.

STATE OF INDIANA,

*Intervening Defendant-Appellant.*

On Appeal from the United States District Court for the
Southern District of Indiana, No. 1:22-cv-1075,
The Honorable Jane Magnus-Stinson

**BRIEF OF ALABAMA AND 18 OTHER STATES
AS *AMICI CURIAE* IN SUPPORT OF APPELLANT**

Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

Steve Marshall
  *Attorney General of Alabama*
Edmund G. LaCour, Jr.
  *Solicitor General*
Thomas A. Wilson
  *Deputy Solicitor General*

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................i

TABLE OF AUTHORITIES .....................................................................iii

INTEREST OF *AMICI* STATES ............................................................ 1

SUMMARY OF THE ARGUMENT .......................................................... 2

ARGUMENT ............................................................................................. 5

    I.   Neither The Constitution Nor Title IX Compels States To Define "Sex" As "Gender Identity." ............................................................................. 5

        A.  Defining sex based on reproductive biology does not violate the Equal Protection Clause. ................................................................... 5

            1.  A.M.'s equal-protection claim is a challenge to Indiana's definition of sex. ............................................................... 6

            2.  Though discriminating based on protected classes warrants heightened scrutiny, defining those classes does not. .......................... 8

            3.  Reproductive biology is a rational basis by which to classify sex. ........................................................................... 12

        B.  Defining sex based on reproductive biology does not violate Title IX. ............................................................................ 16

            1.  Title IX defines sex according to reproductive biology, not gender identity. ..................................................................... 17

            2.  Defining sex based on reproductive biology does not constitute discrimination based on transgender status. ...................... 19

    II.  Defining "Sex" As "Gender Identity" Would Render Many Sex-Conscious Laws Unworkable. ........................................................................... 21

CONCLUSION........................................................................................ 26

ADDITIONAL COUNSEL....................................................................... 28

CERTIFICATE OF WORD COUNT ............................................................... 29

CERTIFICATE OF SERVICE ....................................................................... 30

## TABLE OF AUTHORITIES

**Cases**

*Bostock v. Clayton County,*
140 S. Ct. 1731 (2020) ........................................................................ *passim*

*Bray v. Alexandria Women's Health Clinic,*
506 U.S. 263 (1993) ..................................................................................... 14

*Caskey Baking Co. v. Virginia,*
313 U.S. 117 (1941) ....................................................................................... 8

*Chaney v. Plainfield Healthcare Ctr.,*
612 F.3d 908 (7th Cir. 2010) ....................................................................... 5

*Cochise Consultancy, Inc. v. U.S. ex rel. Hunt,*
139 S. Ct. 1507 (2019) ................................................................................ 18

*F.C.C. v. Beach Commc'ns, Inc.,*
508 U.S. 307 (1993) ..................................................................................... 12

*F.S. Royster Guano Co. v. Commonwealth of Virginia,*
253 U.S. 412 (1920) ....................................................................................... 8

*Frontiero v. Richardson,*
411 U.S. 677 (1973) ........................................................................... 5, 8, 12

*Gebser v. Lago Vista Indep. Sch. Dist.,*
524 U.S. 274 (1998) ..................................................................................... 19

*Geduldig v. Aiello,*
417 U.S. 484 (1974) ..................................................................................... 14

*Glenn v. Brumby,*
663 F.3d 1312 (11th Cir. 2011) .................................................................. 25

*Heller v. Doe by Doe,*
509 U.S. 312 (1993) .......................................................................... 13, 16, 24

*Hoohuli v. Ariyoshi,*
631 F. Supp. 1153 (D. Haw. 1986) ................................................... 9, 11, 12

*Illinois Health Care Ass'n v. Illinois Dep't of Pub. Health,*
879 F.2d 286 (7th Cir. 1989) ........................................................................ 8

*J.E.B. v. Alabama*,
   511 U.S. 127 (1994) ................................................................. 25

*Jana-Rock Construction, Inc. v. New York Department of Econ. Dev.*,
   438 F.3d 195 (2d Cir. 2006) .............................................. *passim*

*Jespersen v. Harrah's Operating Co.*,
   444 F.3d 1104 (9th Cir. 2006) ............................................... 24

*Jones v. Governor of Fla.*,
   975 F.3d 1016 (11th Cir. 2020) ............................................. 13

*Kikamura v. Turner*,
   28 F.3d 592 (7th Cir. 1994) ..................................................... 8

*Lamers Dairy Inc. v. U.S. Dep't of Agr.*,
   379 F.3d 466 (7th Cir. 2004) ................................................. 12

*Lochner v. New York*,
   198 U.S. 45 (1905) ...................................................................... 3

*Miss. Univ. for Women v. Hogan*,
   458 U.S. 718 (1982) ................................................................. 25

*Nabozny v. Podlesny*,
   92 F.3d 446 (7th Cir. 1996) ................................................... 12

*New Prime Inc. v. Oliveira*,
   139 S. Ct. 532 (2019) .............................................................. 18

*Orion Ins. Grp. v. Washington State Off. of Minority & Women's Bus. Enter.*,
   2017 WL 3387344 (W.D. Wash. Aug. 7, 2017), *aff'd sub nom.*
   *Orion Ins. Grp. v. Washington's Off. of Minority & Women's Bus. Enter.*,
   754 F. App'x 556 (9th Cir. 2018) ......................................... 10, 11, 15, 16

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981)....................................................................... 19

*Pers. Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979) ................................................................ 14

*Price Waterhouse v. Hopkins*,
   490 U.S. 228 (1989) ................................................................ 25

*Smith v. United States,*
    508 U.S. 223 (1993) ................................................................................ 17

*Tuan Anh Nguyen v. I.N.S.,*
    533 U.S. 53 (2001) .................................................................................. 13

*United States v. Lock,*
    466 F.3d 594 (7th Cir. 2006) ............................................................. 17, 18

*United States v. Virginia,*
    518 U.S. 515 (1996) ............................................................................ 5, 8, 12

*United States v. Westmoreland,*
    122 F.3d 431 (7th Cir. 1997) ............................................................... 17

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) ............................................................................ 13, 14

*Wisconsin Central Ltd. v. United States,*
    138 S. Ct. 2067 (2018) ......................................................................... 17

## Statutes

20 U.S.C. §1681, *et seq.* ...................................................................... 2, 17

Ind. Code §20-33-13-4 ......................................................................... 6, 7, 19

Ind. Code §20-33-13-4(b) ................................................................... *passim*

## Regulations

34 C.F.R. §106.32 ................................................................................. 21

34 C.F.R. §106.33 ................................................................................. 21

34 C.F.R. §106.41 ................................................................................. 21

34 C.F.R. §106.41(b) ........................................................................... 7, 17, 19

34 C.F.R. §106.41(c) ........................................................................... 20

**Constitutional Provisions**

U.S. Const. amend. XIV, §1 ........................................................ 8

U.S. Const. art. I, §8, cl. 1 ...................................................... 19

**Other Authorities**

Am. Psych. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 AM. PSYCHOLOGIST 862 (Dec. 2015), *available at* https://www.apa.org/practice/guidelines/transgender.pdf ..... 21, 22, 23

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* §30 (2012) ........................................................ 17

Black's Law Dictionary (5th ed. 1979) ...................................... 18

Black's Law Dictionary (11th ed. 2019) .................................... 15

Jason Rafferty, *Policy Statement, Am. Academy of Pediatrics, Ensuring Comprehensive Care & Support for Transgender & Gender-Diverse Children & Adolescents*, 142 Pediatrics no. 4 (Oct. 2018), *available at* https://perma.cc/EE6U-PN66 ................................................ 22

Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, Wash. Post, Apr. 7, 1975 ...................................................... 5

The American Heritage Dictionary of the English Language (1969) ...................... 18

The American Heritage Dictionary (5th ed. 2011) .................................... 18

The Random House College Dictionary (rev. ed. 1975) ............................... 18

Webster's New Collegiate Dictionary (8th ed. 1973) ............................... 18

Webster's New World College Dictionary (5th ed. 2014) ........................... 18

World Professional Ass'n for Transgender Health (WPATH), *Standards of Care for the Health of Transsexual, Transgender, and Gender-Conforming People* (7th Version) (2012) ...................................................... 23

Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guidelines*, 102 J. CLINICAL ENDOCRINOLOGY & METABOLISM (Nov. 2017) ........................ 22, 23

## INTEREST OF *AMICI* STATES

The States of Alabama, Alaska, Arizona, Arkansas, Georgia, Idaho, Kansas, Kentucky, Louisiana, Mississippi, Montana, Nebraska, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and West Virginia, respectfully submit this brief in support of Appellant State of Indiana. Like schools across the Nation, Indiana public schools offer students the chance to compete on athletic teams, including sex-segregated teams for boys and girls. When assigning athletes to sex-segregated teams, the State defines "sex" based on reproductive biology. Many *Amici* States have applied the same definition of sex in a variety of contexts, from sports teams to housing to bathrooms and locker rooms. Moreover, like Indiana, *amici* have school systems that receive federal funding under Title IX.

This case is emblematic of an increasingly popular litigation strategy in which plaintiffs challenge States' use of the traditional, biological definition of sex by arguing that the definition itself—*not* the attendant sex segregation—violates federal law. As is typical in this recent wave of litigation, here a State has enacted a law that adheres to the objective definition of sex that has endured for millennia, and the plaintiff advocates for something quite different: a definition of sex based on individuals' subjective gender identities.

Compelling States to define sex according to gender identity jeopardizes States' ability to enforce lawful sex-conscious policies. Plus, paradoxically, requiring States to abandon an objective definition of sex may force many of them to resort to sex stereotyping as they search for other ways to define "boy" and "girl." Federal law does

not compel this outcome. *Amici* States have a strong interest in ensuring that federal law continues to permit a definition of sex that accords with reproductive biology and allows States to protect the health, safety, welfare, and privacy of all students.

*Amici* States respectfully request the Court to reverse the district court's decision and vacate the preliminary injunction.

## SUMMARY OF THE ARGUMENT

This case is not about whether States may discriminate on the basis of sex (to the contrary, A.M. wants to play on a sex-segregated sports team), or even whether States may discriminate based on transgender status. A.M.'s real grievance lies instead with the contours of Indiana's sex classifications—that is, with Indiana's definition of sex. The question at the heart of this litigation is therefore whether Indiana may define sex according to reproductive biology.

By A.M.'s telling, the answer is no; Indiana may not "rely on its own discriminatory notion of what sex means." DE50:10.[1] But Indiana's "notion of what sex means" is only "discriminatory" insofar as it is objective. Like many States, Indiana passed a law that enforces lawful sex segregation based on a biological definition of sex. To maintain the definition's utility and coherence, the classifications that follow from it—males and females—are necessarily exclusive. But as A.M. would have it, the Equal Protection Clause and Title IX of the Education Amendments of 1972, 20 U.S.C. §1681, *et seq.*, not only forbid States from adopting this objective

---

[1] "DE" refers to docket entries in the district court. Pin cites follow the colon and accord with CM/ECF pagination.

understanding, they affirmatively compel its opposite—a definition of sex based on individuals' subjective gender identities. A.M. is wrong on both counts, and A.M.'s subjective definition of sex would render Indiana's law and many other sex-conscious laws unworkable.

**I.A.** A.M.'s constitutional claim is fundamentally an underinclusiveness challenge to Indiana's definition of sex and thus receives only rational basis review. A.M. does not challenge the decision to limit spots on the girls' softball team only to girls, but instead essentially complains that Indiana's definition of "girl" should extend to include biological males. While a State's initial decision to adopt a policy that differentiates based on a protected characteristic warrants heightened scrutiny, the contours of the State's classifications require only a rational basis. This makes good sense; the purpose of heightened scrutiny is to evaluate whether a State's interests can justify treating its citizens differently on the basis of the characteristics. But where such justifications exist, challenges to the contours of the classification are simply challenges to the State's method of effecting lawful policy, thus warranting only rational basis. Indiana's decision to define the relevant sex-based classifications (boys and girls) in terms of reproductive biology (males and females) easily survives rational basis review. "The 14th Amendment [did] not enact Mr. Herbert Spencer's Social Statics" in the early twentieth century, *Lochner v. New York*, 198 U.S. 45, 75 (1905) (Holmes, J., dissenting), and it does not enact a radical reconceptualization of sex and gender today.

**I.B.** At bottom, A.M.'s statutory claim also relies on a terminological dispute and fails for similar reasons. Though A.M. does not appear to argue that Title IX defines sex in terms of gender identity, A.M. never quite explains how Indiana's biological definition of sex is supposed to violate the statute. Instead, A.M. obliquely cites *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), for the proposition that "[d]iscrimination on the basis of transgender status constitutes discrimination 'on the basis of sex.'" DE24:16. While *Bostock* supports this proposition (in the employment-discrimination context), A.M. seems to argue the converse; that is, that discrimination on the basis of sex constitutes discrimination on the basis of transgender status. But A→B does not validate the proposition B→A. So to avoid an obvious logical fallacy, A.M. would have to argue that Indiana's decision to implement a biological definition of sex necessarily implies animus against transgender individuals. Such a presumption, however, would contravene well-established Supreme Court doctrine, and A.M.'s failure to offer evidence of anti-transgender animus forecloses any attempt to shoehorn this case into *Bostock*'s syllogism.

**II.** What's more, the subjective definition of sex that A.M. seeks to impose on Indiana would render unadministrable many lawful sex-conscious laws. Subjective gender identities cannot form the basis of an objective, durable definition of sex. Even worse, A.M.'s new definition of sex trades on stereotypes about how biological males and females think, behave, and perform. And it's hardly surprising that sex stereotyping would follow when defining sex according to gender identity. Unless the definition relies solely on an invisible sense of self, it must find some objective criteria to

externally validate subjective claims. But federal law does not mandate that States adopt a view of sex and gender that is either unmoored from objective criteria or tied to sex stereotyping. Rather, States may define sex based on reproductive biology. Doing so is perfectly rational and completely lawful.

## ARGUMENT

## I.     Neither The Constitution Nor Title IX Compels States To Define "Sex" As "Gender Identity."

### A. Defining sex based on reproductive biology does not violate the Equal Protection Clause.

A.M.'s constitutional claim reduces to the proposition that Indiana's definition of sex violates the Constitution because it defines sex according to reproductive biology rather than gender identity. This argument is self-refuting. The law of the land has always taken a biological definition of sex for granted, recognizing that "physical differences between men and women are enduring: The two sexes are not fungible." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (cleaned up); *see also, e.g.*; *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.) ("[S]ex … is an immutable characteristic determined solely by the accident of birth."); *cf.* Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, Wash. Post, Apr. 7, 1975, at A21 ("Separate places to disrobe, sleep, [and] perform personal bodily functions are permitted, in some situations required, by regard for individual privacy."); *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 913 (7th Cir. 2010) ("[T]he law tolerates same-sex restrooms ... to accommodate privacy needs."). A.M.'s constitutional claim should end here.

But even if A.M. could viably argue that the definition of sex adopted throughout the Supreme Court's equal-protection jurisprudence somehow triggered an equal-protection violation, the State would still have leeway to decide how to define the term. Indeed, where a definition implicates a protected class, the definition of the class—as opposed to differential treatment based on the class—warrants only rational basis review. Because no evidence suggests that intentional discrimination motivated the State's decision to classify sex by reproductive biology, and because myriad rational reasons support this standard definition of sex, A.M.'s equal-protection argument fails on these terms as well.

### 1. A.M.'s equal-protection claim is a challenge to Indiana's definition of sex.

A.M. is a biological male who identifies as a girl and wants to play on a girls' softball team. DE61:1 (hereafter "Op."). Indiana's House Enrolled Act 1041 ("HEA 1041") states that a "[a] male" "may not participate" on a "girls' athletic team or sport." Ind. Code §20-33-13-4(b). After the Indiana Legislature passed HEA 1041, A.M. sued to preliminarily enjoin the Act, asserting that "HEA 1041 violates both Title IX, and the Equal Protection Clause of the United States Constitution" because it "bar[s] transgender female students from participating on female sports teams." DE24:2.

A.M. relies on *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), for the proposition that "discrimination on the basis of transgender status … clearly constitutes discrimination 'on the basis of sex,'" DE24:19. But claims like A.M.'s present *Bostock*'s mirror image; whereas the employer in *Bostock* expressly targeted and punished an

employee for being transgender, 140 S. Ct. at 1737-38, HEA 1041 is facially neutral toward transgender status—biological males, whether transgender or not, cannot play on a girls' team. Indeed, HEA 1041 focuses solely on sex and enforces the longstanding division between boys' and girls' sports—a form of sex segregation that Title IX undoubtedly permits. *See* 34 C.F.R. §106.41(b). The heart of A.M.'s claim therefore is *not* that "discrimination based on … transgender status necessarily entails discrimination based on sex," *Bostock*, 140 S. Ct. at 1747, but the converse—that is, that discrimination based on sex "necessarily entails" discrimination based on transgender status. Nothing in *Bostock* supports that radically different (and obviously flawed) theory.

The only way A.M. can convert a statute that lawfully segregates interscholastic athletes on the basis of sex into a statute that unlawfully discriminates on the basis of transgender status is to assert that Indiana's traditional definition of sex inherently discriminates against those who simultaneously identify as both "male" (Ind. Code §20-33-13-4) and "a girl" (Op. 13). So this is precisely the tack A.M. takes, asserting that Indiana may not "rely on its own discriminatory notion of what sex means." DE50:10 (internal quotation marks omitted). A.M.'s attempt to impose a new definition of sex by judicial fiat fails. As explained below, a State's definition of sex requires only rational basis, and numerous rational bases support a State's decision to define sex as it has always been defined—on the basis of reproductive biology.

## 2. Though discriminating based on protected classes warrants heightened scrutiny, defining those classes does not.

The Equal Protection Clause of the Fourteenth Amendment prohibits a State from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, §1. The Clause applies where governments treat similarly situated groups differently. *See, e.g.*, *Frontiero*, 411 U.S. at 682-83. Where a government classifies people into a specific group and tethers legal treatment to that classification, an equal-protection claim arises. *See, e.g., Virginia*, 518 U.S. at 532-33 (sex-discrimination jurisprudence "focus[es]" on "differential treatment").

But "[c]lassification is not discrimination," *Caskey Baking Co. v. Virginia*, 313 U.S. 117, 121 (1941), and "the 'equal protection of the laws' required by the Fourteenth Amendment does not prevent the states from resorting to classification for the purposes of legislation," *F.S. Royster Guano Co. v. Commonwealth of Virginia*, 253 U.S. 412, 415 (1920). The point of heightened scrutiny is to determine whether a State can justify treating its citizenry differently "on the basis of one's membership in a protected class." *Kikamura v. Turner*, 28 F.3d 592, 600 (7th Cir. 1994). Where, as here, the decision to discriminate has already survived heightened scrutiny and the plaintiff merely challenges the contours informing the discrimination—that is, the State's understanding of sex itself—there is no further "implication of any constitutionally protected fundamental right (or suspect classification)," which makes "heightened scrutiny … indisputably inappropriate." *Illinois Health Care Ass'n v. Illinois Dep't of Pub. Health*, 879 F.2d 286, 288 n.4 (7th Cir. 1989). The contours of HEA 1041's lawful sex segregation thus require only a rational basis.

Challenges to States' definitions of racial classifications underscore this con-
clusion. Where a court "is not asked to pass on the constitutionality of [an affirmative-
action] program or of the racial preference itself," but is asked instead "to examine
the parameters of the beneficiary class," the court engages in "a traditional 'rational
basis' inquiry as applied to social welfare legislation." *Hoohuli v. Ariyoshi*, 631 F.
Supp. 1153, 1159 (D. Haw. 1986). The Second Circuit explicated this principle in
*Jana-Rock Construction, Inc. v. New York Department of Economic Development*. 438
F.3d 195 (2d Cir. 2006). There, plaintiff Rocco Luiere owned a construction company
and was "the son of a Spanish mother whose parents were born in Spain," but he was
not considered Hispanic for purposes of New York's affirmative-action program for
minority-owned businesses. *Id.* at 199. (This despite Luiere's sworn affidavit stating,
"I am a Hispanic from Spain." *Id.* at 203.) Like the plaintiff in *Hoohuli*, Luiere did
not "challenge the constitutional propriety of New York's race-based affirmative ac-
tion program," but only the State's decision not to classify him as Hispanic for pur-
poses of the program. *Id.* at 200, 205.

On its way to rejecting Luiere's claim, the Second Circuit confirmed that strict
scrutiny applied "to ensure that the government's choice to use racial classifications
[was] justified," but that "the contours of the specific racial classification that the
government chooses" required only a rational justification. *Id.* at 210. As that court
explained, "[t]he purpose of [strict scrutiny] is to ensure that the government's choice
to use racial classifications is justified, not to ensure that the contours of the specific
racial classification that the government chooses to use are in every particular

correct." *Id.* And because "[i]t [was] uncontested by the parties" that New York's affirmative-action program satisfied strict scrutiny, a heightened level of review retained "little utility in supervising the government's definition of its chosen categories." *Id.* Although a State's classifications may "appear arbitrary or unfair to persons classified as being within or without the chosen category," this alleged underinclusiveness is insufficient to subject the classifications themselves to heightened scrutiny. *Id.*

Consider also the case of Ralph Taylor. In August 2010, Taylor "received results from a genetic ancestry test that estimated that he was 90% European, 6% Indigenous American, and 4% Sub-Saharan African." *Orion Ins. Grp. v. Washington State Off. of Minority & Women's Bus. Enterprises*, 2017 WL 3387344, at *2 (W.D. Wash. Aug. 7, 2017), *aff'd sub nom. Orion Ins. Grp. v. Washington's Off. of Minority & Women's Bus. Enterprises*, 754 F. App'x 556 (9th Cir. 2018). This was big news for a man who "grew up thinking of himself as Caucasian." *Id.* Once Taylor "realized he had Black ancestry, he 'embraced his Black culture.'" *Id.* He "joined the NAACP" and began to "take[] great interest in Black social causes." *Id.* at *3. Taylor even "subscribed to Ebony magazine." *Id.* at *3. And believing his new identity might bestow economic rewards, Taylor classified himself as "Black" and applied for special benefits under State and federal affirmative-action programs. *Id.* at *2-3.

The programs' managers rejected Taylor's proposed racial classification and denied his application, so Taylor brought suit alleging, among other things, that the State and federal governments' restrictive definition of "Black" violated his

10

constitutional and statutory rights. *Id.* at *4. He advocated an expansive definition of "Black," asserting he fit into the category because "Black Americans are defined to include persons with 'origins' in the Black racial groups in Africa" and his genetic testing revealed he had African ancestry. *Id.* at *11. The court summarily dispatched with Taylor's claim, explaining that "construing the narrower definition as broadly as [Taylor] advocates would strip the provision of all exclusionary meaning." *Id.* "It is commonly acknowledged that all of mankind 'originated' in Africa," the court continued, so "if any (Black) African ancestry[,] no matter how attenuated, sufficed for [the affirmative-action program's] purposes, then this particular definition would be devoid of any distinction." *Id.* Rather than apply heightened scrutiny and force the State to justify its definition of "Black," the court recognized the definition's rational basis and rejected Taylor's claim accordingly. *Id.* at *13 ("Both the State and Federal Defendants offered rational explanations for the denial of the application."); *see also, e.g., Hoohuli*, 631 F. Supp. at 1160-61 (concluding affirmative-action program's "definition of 'Hawaiian' … ha[d] a rational basis").

By challenging the lawfulness of a classification's definitional contours rather than the lawfulness of the classification itself, A.M. follows exactly the same path as Rocco Luiere and Ralph Taylor. Just as those plaintiffs sought to benefit from racially discriminatory regimes and merely quibbled over how the races were defined, A.M. endorses sex-segregated sports and only challenges Indiana's "notion of what sex means," DE50:10. Because the "purpose" of heightened scrutiny "is to ensure that the government's choice to use [protected] classifications is justified," not to police the

classifications' "contours," *Jana-Rock*, 438 F.3d at 210; *cf. Hoohuli*, 631 F. Supp. at 1159 n.23 ("The mere mention of the term 'race' does not automatically invoke the 'strict scrutiny' standard."), the "contours" attendant to Indiana's definition of sex warrant only rational basis review.

### 3. Reproductive biology is a rational basis by which to classify sex.

Rational basis review "is a paradigm of judicial restraint." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993). "Under rational basis review there is no constitutional violation if 'there is any reasonably conceivable state of facts' that would provide a rational basis for the government's conduct." *Nabozny v. Podlesny*, 92 F.3d 446, 458 (7th Cir. 1996) (quoting *Beach Commc'ns*, 508 U.S. at 313-14 (1993)); *see also, e.g.*, *Lamers Dairy Inc. v. U.S. Dep't of Agr.*, 379 F.3d 466, 473 (7th Cir. 2004) ("Governmental action only fails rational basis scrutiny if no sound reason for the action can be hypothesized.").

A definition of sex rooted in reproductive biology easily survives this inquiry. Though the Supreme Court's imprimatur is unnecessary to make the point, as noted above, the high Court has always taken this biological baseline for granted. *See, e.g., Virginia*, 518 U.S. at 533; *Frontiero*, 411 U.S. at 686 (plurality op.) ("[S]ex … is an immutable characteristic determined solely by the accident of birth."); *Bostock*, 140 S. Ct. at 1739 (proceeding "on the assumption that 'sex' ... refer[s] only to biological distinctions between male and female").

And even an imperfect definition would not jeopardize HEA 1041's constitutionality. Assuming for the sake of argument that transgender individuals like A.M.

are correctly defining their own sexes and that a biological definition of sex misidentifies them, "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller v. Doe by Doe*, 509 U.S. 312, 321 (1993). Indeed, not even heightened scrutiny demands that the State's definition "achiev[e] its ultimate objective in every instance." *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 70 (2001). A 99.4% success rate will suffice. *See* Op. 9 ("Studies indicate that up to 0.6% of adolescent and adult individuals in Indiana identify as transgender.").

Thus, even assuming transgender individuals constitute a protected class, *but see* DE36:26-29 (explaining why "[t]ransgender status cannot satisfy the criteria necessary for protected classification"), to succeed A.M. must at least show Indiana's "intent to harm" transgender individuals by enforcing its objective definition of sex, *Jana-Rock*, 438 F.3d at 211. *See, e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of ... discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."); *Jones v. Governor of Fla.*, 975 F.3d 1016, 1034 (11th Cir. 2020) (en banc) ("[T]he Supreme Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny. In the rare instances when it has done so, a common thread has been that the laws at issue lack any purpose other than a bare desire to harm a politically unpopular group.") (internal quotation marks omitted)).

Despite asserting that Indiana's "notion of sex" is unlawfully "discriminatory" (DE50:10), A.M. offers no evidence that "invidious gender-based discrimination"

pervades Indiana's decision to define sex according to reproductive biology. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979). Just as Luiere could "point to nothing in the history of Article 15-A and its enforcement or the sequence of events leading up to its enactment that would support an inference of anti-Spanish animus," *Jana-Rock*, 438 F.3d at 212, A.M. is equally unable to offer evidence showing that HEA 1041 deliberately discriminates against transgender individuals.

At most, A.M. has shown that defining sex in terms of reproductive biology may disparately impact transgender individuals who object to the way Indiana classifies them. But disparate impact does not raise a presumption of unlawful classification or transgender animus. *See, e.g.*, *Geduldig v. Aiello*, 417 U.S. 484 (1974) (state insurance policy excluding pregnancy coverage did not classify on basis of sex); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269-70 (1993) (rejecting assertion that "opposition to abortion reflects an animus against women"). Simply put, "'[d]iscriminatory purpose' ... 'implies more than ... awareness of consequences.'" *Bray*, 506 U.S. at 271 (quoting *Feeney*, 442 U.S. at 279). Though some facially neutral State action may so disproportionately impact one class that "an intent to disfavor that class can readily be presumed"—like "[a] tax on wearing yarmulkes," *id.* at 270—Indiana's decision to adopt the standard definition of sex is a far cry from any such blatantly discriminatory action. The absence of record evidence showing any "discriminatory intent or purpose" dooms A.M.'s claim. *Arlington Heights*, 429 U.S. at 265.

The district court attempted to plug the gap in A.M.'s legal argument by creatively asserting that "[a] law that prohibits an individual from playing on a sports team that does not conform [*sic*] to his or her gender identity *punishes* that individual for his or her gender non-conformance, which violates the clear language of Title IX." Op. 21 (cleaned up; emphasis added).[2] That is, by enforcing an objective definition of sex Indiana necessarily "punishes" those who advocate a subjective definition of sex. Following the court's reasoning, the States of New York and Washington "punishe[d]" Rocco Luiere and Ralph Taylor by declining to expand their definitions of "Hispanic" and "Black" to include all individuals with Spanish ancestry, *Jana-Rock*, 438 F.3d at 199, or "4% Sub-Saharan African" genetics, *Orion*, 2017 WL 3387344, at *2, respectively, in turn generating serious racial-discrimination claims. But as the courts evaluating those claims undoubtedly recognized, this simply is not what "punish[ment]" means or has ever meant. *Accord, e.g.*, *Punishment*, Black's Law Dictionary (11th ed. 2019) ("1. A sanction—such as a fine, penalty, confinement, or loss of property, right, or privilege—assessed against a person who has violated the law."). Federal law bestows no "right" or "privilege" to define sex according to gender identity. While segregation on the basis of sex might give rise to a compelling non-discrimination challenge, defining the contours of the segregation does not.

---

[2] Given that HEA 1041 "prohibits" A.M. from playing on a sports team that purportedly *does* conform with A.M.'s gender identity, presumably the district court did not mean to negative the word "conform." This linguistic mix-up highlights the unintelligibility of the court's interpretation of federal law.

15

A.M.'s preferred definition of "girl" would render Indiana's classification "devoid of any distinction" and thus "strip [HEA 1041] of all exclusionary meaning." *Orion*, 2017 WL 3387344, at \*11. That is reason enough to reject it. *See, e.g.*, *Heller*, 509 U.S. at 320-21 ("A statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.") (internal citations, quotation marks omitted). And the district court's attempt to divine animus only reveals its absence, in turn removing whatever doubt may have lingered over whether Indiana's traditional, objective definition of sex violates the Equal Protection Clause.

### B. Defining sex based on reproductive biology does not violate Title IX.

A.M. declined to articulate exactly how Indiana's biological definition of sex triggers Title IX liability. But there are two theories under which A.M.'s assertions could plausibly state a Title IX claim, and both reduce to a dispute over the definition of sex. First, Title IX might define sex in terms of gender identity. This position is plainly incorrect and flies in the face of well-settled methods of interpretation. Second, Title IX might understand an objective definition of sex inherently to constitute unlawful gender-identity discrimination—which in turn would produce a viable sex-discrimination claim under *Bostock* (assuming, for the sake of argument, that *Bostock*'s logic applied outside Title VII). This theory fails for the obvious reason that the standard definition of sex says nothing about gender identity. A.M.'s repackaged challenge to the enduring, biological definition of sex is no more successful under Title IX than it is under the Fourteenth Amendment.

**1. Title IX defines sex according to reproductive biology, not gender identity.**

Title IX mandates that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. §1681(a). But the statute's implementing regulations permit certain forms of sex discrimination, including, as relevant here, "separate teams for members of each sex." 34 C.F.R. §106.41(b). If HEA 1041 is valid under Title IX, then Title IX also permits IPS to require all students, including A.M., to follow that policy. *Cf.* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* §30, at 192-93 (2012) ("[W]henever a power is given by a statute, everything necessary to making it effectual or requisite to attaining the end is implied."). A.M.'s statutory claim depends on whether HEA 1041 violates Title IX by enforcing a biological definition of sex, which in turn depends on how Title IX defines the term "sex."

"[I]t's a 'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary ... meaning ... at the time Congress enacted the statute.'" *Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018); *accord United States v. Lock*, 466 F.3d 594, 598 (7th Cir. 2006) ("[This Court] assume[s] that the legislative purpose [of the statute] is expressed by the ordinary meaning of the words used."). That includes terms a statute leaves undefined. *See United States v. Westmoreland*, 122 F.3d 431, 435 (7th Cir. 1997) ("'When a word is not defined by statute, [the Supreme Court] normally construe[s] it in accord with its ordinary or natural meaning.'") (quoting *Smith v. United States*, 508 U.S. 223, 228

(1993)). "After all, if judges could freely invest old statutory terms with new meanings, [courts] would risk amending legislation outside the 'single, finely wrought and exhaustively considered, procedure' the Constitution commands," and "would risk, too, upsetting reliance interests in the settled meaning of a statute." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019).

There can be no question that, at the time of Title IX's passage, the ordinary meaning of sex defined males and females by objective, biological criteria relating to reproductive function. *See, e.g.*, *Sex*, *The American Heritage Dictionary of the English Language* (1969) ("1. a. The property or quality by which organisms are classified according to their reproductive functions."); *Sex*, *Webster's New Collegiate Dictionary* (8th ed. 1973) ("1: either of two divisions of organisms distinguished respectively as male or female"); *Sex*, *The Random House College Dictionary* (rev. ed. 1975) ("1. Either the male or female division of a species, esp. as differentiated with reference to the reproductive functions."); *Sex*, *Black's Law Dictionary* (5th ed. 1979) ("The sum of the peculiarities of structure and function that distinguish a male from a female organism; the character of being male or female.").[3] And because "a statutory phrase must have a fixed meaning," *Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*, 139 S. Ct. 1507, 1512 (2019), this definition of sex does not fluctuate with claimants' subjective

---

[3] Although contemporaneous definitions control statutory analysis, *see Lock*, 466 F.3d at 598, it is worth noting that the passage of time has only reaffirmed the durability of sex's objective definition based on reproductive biology. *See, e.g.*, *Webster's New World College Dictionary* 1331 (5th ed. 2014) ("either of the two divisions, male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions"); *The American Heritage Dictionary* 1605 (5th ed. 2011) (same).

gender identities. The ordinary meaning of sex thus forecloses the theory that Title IX requires federally funded entities to classify "[a] male, based on … biological sex" (Ind. Code §20-33-13-4(b)) as "a girl" (Op. 13).

Moreover, because Congress enacted Title IX under the so-called Spending Clause, U.S. Const. art. I, §8, cl. 1, even if Title IX's definition of sex were unclear Indiana's failure to account for definitional ambiguity still would not trigger liability. "The legitimacy of Congress' power to legislate under the spending power … rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). So "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.* Because these contractual attributes inform the scope of Title IX, *see, e.g.*, *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287-88 (1998), IPS can face liability under the statute only if applying a biological definition of sex *unambiguously violates* Title IX's safe harbor for sex-segregated sports teams (34 C.F.R. §106.41(b)). But for all the reasons discussed above, a biological definition of sex is consonant with, not counter to, Title IX, foreclosing any claim that Title IX prohibits States from enforcing this definition.

### 2. Defining sex based on reproductive biology does not constitute discrimination based on transgender status.

So much for the first option. The other path to a cognizable gender-identity-discrimination claim under Title IX is to argue that a State's objective definition of sex necessarily constitutes discrimination based on transgender status. If that were true, then the *Bostock* Court's maxim that (under Title VII) "discrimination based on

homosexuality or transgender status necessarily entails discrimination based on sex," 140 S. Ct. at 1747, might suggest an objective definition of sex could give rise to a viable sex-discrimination claim under Title IX. But, as explained above, *supra* §I.A.3, neither A.M. nor the district court have identified any discrimination based on transgender status. Thus, to fit within *Bostock*'s syllogism rather than affirm its consequent, A.M. and the district court attempt to incorporate animus into the traditional definition of sex.

The same defect that plagues A.M.'s constitutional argument likewise infects A.M.'s Title IX claim: At bottom, A.M. is not challenging unlawful segregation or animus; A.M. is challenging the legitimacy of defining sex by reproductive biology. A.M. does not argue that IPS's implementation of the segregation fails to "provide equal athletic opportunity for members of both sexes," 34 C.F.R. §106.41(c), or that HEA 1041's segregation of male and female sports violates Title IX. A.M.'s claim then can be only that Indiana's objective definition of sex—*i.e.*, the "contours" of HEA 1401's lawful sex segregation, *Jana-Rock*, 438 F.3d at 210—necessarily constitutes transgender discrimination, and accordingly gives rise to a sex-discrimination claim under the logic of *Bostock*.

No evidence supports the remarkable contention that a biological definition of sex is inherently unlawful, and *Bostock* never remotely endorsed such a presumption. Just the opposite—*Bostock* "proceed[ed] on the assumption that 'sex' ... refer[s] only to biological distinctions between male and female," 140 S. Ct. at 1739, which is the understanding of sex employed in both HEA 1041 and Title IX. Indeed, reading

*Bostock* to find anti-transgender discrimination wherever an entity adheres to biological sex classifications would have called into question Title IX itself, for the statute adopts such classifications (*supra* §I.B.1) and insulates various forms of sex discrimination from liability. *See, e.g.*, 34 C.F.R. §106.32 (housing); *id.* §106.33 (facilities); *id.* §106.41 (athletics).

Neither *Bostock*'s holding nor its reasoning convert a biological definition of sex into Title IX liability. A.M. failed to show that HEA 1041 targets transgender individuals, and embracing the same traditional understanding of sex implemented in both *Bostock* and Title IX raises no such presumption.

## II. Defining "Sex" As "Gender Identity" Would Render Many Sex-Conscious Laws Unworkable.

Because the district court left the implications of its decision entirely unexplored, it missed several obvious problems with outlawing an objective definition of sex. But even brief consideration of the decision's implications reveals the problems it invites.

Start with defining sex based on an individual's averred "gender identity." Op. 21. While reproductive biology offers a stable, objective definition of "sex," the concept of "gender identity" is fluid, subjective, and resists coherent line-drawing. Indeed, the American Psychological Association (APA) notes that "gender identity is internal," so "a person's gender identity is not necessarily visible to others." Am. Psych. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 AM. PSYCHOLOGIST 862 (Dec. 2015), *available at* https://www.apa.org/practice/guidelines/transgender.pdf (hereafter "APA Guidelines"); *see also id.* at 836

21

(asserting some individuals "experience their gender identity as fluid"). And according to the American Academy of Pediatrics (AAP), "gender identity can be fluid, shifting in different contexts." Jason Rafferty, *Policy Statement, Am. Academy of Pediatrics, Ensuring Comprehensive Care & Support for Transgender & Gender-Diverse Children & Adolescents*, 142 Pediatrics no. 4 at 2 (Oct. 2018), *available at* https://perma.cc/EE6U-PN66 (hereafter "AAP Statement"). There are also those who seek to "redefine gender" or who "decline to define themselves as gendered altogether"—who "think of themselves as both man and woman (bi-gender, pangender, androgyne); neither man nor woman (genderless, gender neutral, neutrois, agender); moving between genders (genderfluid); or embodying a third gender." APA Guidelines at 862. No State can coherently classify men and women based on private, "internal," "fluid" feelings that might not even be "visible to others."

But it gets worse. Attempting to define a "transgender" class is a fool's errand. As the AAP points out, "transgender" is "not [a] diagnos[i]s," but a "personal" and "dynamic way[] of describing one's own gender experience." AAP Statement at 3.  And while some guidelines note that not all "gender diverse" people identify as "transgender," AAP Statement at 2, others use "transgender" as "an umbrella term" that includes "a diverse group of individuals." Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guidelines*, 102 J. CLINICAL ENDOCRINOLOGY & METABOLISM 3869 (Nov. 2017) (hereafter "Endocrine Society Guidelines"); *see also* World Professional Ass'n for Transgender Health (WPATH), *Standards of Care for the Health of*

*Transsexual, Transgender, and Gender-Conforming People* 97 (7th Version) (2012) (hereafter "WPATH Guidlines"). Depending on who you ask, the term covers people who identify with any of the following gender identities: "boygirl," "girlboy," "gender-queer," "eunuch," "bigender," "pangender," "androgyne," "genderless," "gender neutral," "neutrois," "agender," "genderfluid," and "third gender," and many others. WPATH Guidelines at 96; APA Guidelines at 862; Endocrine Society Guidelines at 3875.

And as A.M.'s expert explained, many individuals identify themselves as "gender nonbinary," which means they sometimes identify as neither "male" nor "female." *See* DE36-5:76:11-77:8;[4] *see also* APA Guidelines at 862 (noting that a "recent study reported that the majority of transgender-identifying youth (63%) now have a nonbinary identity"). If these various medical groups and A.M.'s expert are correct, then "transgender" could cover everyone from the "genderqueer" and "pangender" to the "genderfluid" and "genderless." The reasoning of the district court's opinion would compel States to permit all such individuals to play on sex-segregated teams simply based on whichever sex "[t]hey may lean toward." DE36-5:76:19. States forced to define sex according to subjective (and even shifting) perceptions lose the ability to meaningfully distinguish between males and females.

It is no answer to claim, as A.M. does, that an objective, biological definition of sex is improper in this case because A.M. is supposedly "indistinguishable from other girls her age," "has no competitive or physiological advantages over her teammates

---

[4] Transcript citations accord with native pagination.

or opponents," and "is not particularly accomplished at the sport." DE24:20. States are not required to tailor laws (let alone the definitions of the terms informing the law's application) to every individual's unique circumstances. *See, e.g.*, *Heller*, 509 U.S. at 321 ("A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality. The problems of government are practical ones and may justify, if they do not require, rough accommodations.") (internal citations, quotation marks omitted); *Jespersen v. Harrah's Operating Co.*, 444 F.3d 1104, 1112 (9th Cir. 2006) (en banc) (rejecting "makeup requirement" as legally cognizable sex-discrimination claim lest the court "come perilously close to holding that every grooming, apparel, or appearance requirement that an individual finds personally offensive, or in conflict with his or her own self-image, can create a triable issue of sex discrimination").

Worse still, A.M.'s low-skill carveout to Indiana's definition of sex rests on the assumption that A.M. fits in better with girls because A.M. "is not a particularly gifted softball player" (DE50:1) and is "one of the weaker athletes on the team" (Op. 11), which highlights an insidious implication of the lower court's decision: It pushes Indiana to engage in the sort of sex stereotyping federal law forbids in other contexts. A.M. claims, for example, that A.M. "appear[s] as a girl at home and in public." DE24:11. But what test should Indiana apply to determine how "a girl" should "appear[]" (and how would the test apply to "pangender" or "third gender" students)?

The district court would have Indiana define sex according to gender identity, but then define gender identity according to sex stereotypes. If a State is to implement

objective criteria to externally validate subjective claims, barring reproductive biology, any other objective criteria—like indications of whether a claimant is "one of the weaker athletes"—will trade on presumptions about males and females. Such an approach prods States to "presume that men and women's appearance and behavior will be determined by their sex," which may in turn "embody 'the very stereotype the law condemns,'" *Glenn v. Brumby*, 663 F.3d 1312, 1320 (11th Cir. 2011) (quoting *J.E.B. v. Alabama*, 511 U.S. 127, 138 (1994)).

Defining sex according to gender identity would place Indiana in the perilous position of having to classify its sports teams based on whoever "'walk[s] more femininely, talk[s] more femininely, dress[es] more femininely, wear[s] make-up, ha[s] her hair styled, and wear[s] jewelry." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 235 (1989) (plurality op.). Can it really be that federal law permits A.M. to play on a girls' team so long as a State (or federal court) decides that A.M. runs or throws "like a girl"? Should a child's sex be determined by the number of pullups she or he can complete? In sum, must States define sex based on "fixed notions" about the "abilities of males and females"? *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982). Of course not. States need not define sex based on sex stereotypes. Defining sex based on sex will do.

*     *     *

In the final analysis, the district court codified its sympathies and substituted them for federal law. The court never stopped to explain why dividing sports teams by sex instead of gender identity constitutes "punish[ment]" for "gender non-

25

conformance." Op. 21. Instead, it declared that its conclusion was "not even a close call" (Op. 20) and elided crucial legal analysis with repeated admonitions that prohibiting A.M. from playing girls' softball would be "extremely traumatic for her," *id.* at 13, 22 ("extremely traumatizing"), 23 (same). To be sure, A.M.'s plight is a sympathetic one, and any "trauma[]" that flows from Indiana's traditional definition of sex is deeply unfortunate. But when a federal court is tasked with evaluating alleged violations of the Constitution and Title IX, personal hardship is not dispositive; the court must determine what the law demands. And no law demands that Indiana attempt to define sex in terms of inherently subjective phenomena like gender identity.

Despite A.M.'s insistence, this case is not merely about "a ten-year-old girl who just wants to play softball." DE50:2. This case is about whether States may objectively define sex on the basis of reproductive biology. The answer is yes, as neither the Constitution nor Title IX compels otherwise.

## CONCLUSION

This Court should reverse the district court's decision and vacate the preliminary injunction.

Respectfully submitted,

Steve Marshall
  *Attorney General of Alabama*

*s/Edmund G. LaCour, Jr.*
Edmund G. LaCour, Jr.
  *Solicitor General*

Thomas A. Wilson
  *Deputy Solicitor General*

Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

27

## ADDITIONAL COUNSEL

TREG TAYLOR
Attorney General
State of Alaska

LESLIE RUTLEDGE
Attorney General
State of Arkansas

LAWRENCE WASDEN
Attorney General
State of Idaho

DANIEL CAMERON
Attorney General
Commonwealth of Kentucky

LYNN FITCH
Attorney General
State of Mississippi

DOUG PETERSON
Attorney General
State of Nebraska

ALAN WILSON
Attorney General
State of South Carolina

HERBERT SLATERY III
Attorney General
State of Tennessee

SEAN REYES
Attorney General
State of Utah

MARK BRNOVICH
Attorney General
State of Arizona

CHRISTOPHER M. CARR
Attorney General
State of Georgia

DEREK SCHMIDT
Attorney General
State of Kansas

JEFF LANDRY
Attorney General
State of Louisiana

AUSTIN KNUDSEN
Attorney General
State of Montana

JOHN M. O'CONNOR
Attorney General
State of Oklahoma

MARK VARGO
Attorney General
State of South Dakota

KEN PAXTON
Attorney General
State of Texas

PATRICK MORRISEY
Attorney General
State of West Virginia

**CERTIFICATE OF WORD COUNT**

I verify that this brief, including footnotes and issues presented, but excluding

certificates, contains 6,764 words according to the word-count function of Microsoft

Word, the word-processing program used to prepare this brief.


By: <u>*s/ Edmund G. LaCour, Jr.*</u>
Edmund G. LaCour, Jr.
*Solicitor General of Alabama*

29

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>*s/ Edmund G. LaCour, Jr.*</u>
Edmund G. LaCour, Jr.
 *Solicitor General of Alabama*

Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

30